**HRW SYSTEMS, INC., Clark Enterprises, Inc., Plaintiffs,**

**Marshall P. Powell, Barbara S. Powell, Eliot P.Y. Powell, Shirley T. Powell, Intervenors,**

v.

**WASHINGTON GAS LIGHT COMPANY, Defendant.**

**Civ. A. No. S 91–3143.**

United States District Court, D. Maryland.

June 9, 1993.

Richard W. Fields, Charles H. Samel, and Michele Arington, Howrey & Simon, Washington, DC, for plaintiffs HRW Systems, Inc., and Clark Enterprises, Inc.

Larry S. Gondelman, Dianne H. Kelly, and Kenneth B. Mehlman, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, for Marshall P. Powell, Eliot P.Y. Powell, Barbara S. Powell, and Shirley T. Powell.

Thomas H. Truitt, J. Brian Molloy, and Cynthia J. Morris, Piper & Marbury, Washington, DC, for defendant Washington Gas Light Company.

## MEMORANDUM OPINION

SMALKIN, District Judge.

This case is currently before the Court on the following motions: Plaintiff's (HRW and Clark Enterprises, Inc. ("HRW")) Motion for Partial Summary Judgment on Liability; Plaintiffs' (Marshall P. Powell, Barbara S. Powell and Shirley T. Powell ("Powell")) Motion for Partial Summary Judgment on Liability; Defendant Washington Gas Light Company's ("Washington Gas") Motion for Summary Judgment as to Successor Liability, its Motion for Summary Judgment as to Counts II–IV as to the HRW plaintiffs, and its Motion for Summary Judgment as to Counts II–IV as to the Powell plaintiffs. The relevant replies and oppositions have been made, and no oral hearing is necessary. Local Rule 105.6 (D.Md.).

## I. FACTUAL BACKGROUND

This lawsuit involves industrial property located in Prince George's County, Maryland, now owned by HRW[1].

In 1991, this property was the subject of a contract of sale between HRW and Genstar Stone Products Company ("Genstar") for a sum in excess of $2.6 million. The deal fell through in June 1991, however, when coal-tar[2] was discovered below the surface of the property.

HRW claimed to have no knowledge of how the coal-tar came to be on the property. After an investigation was conducted, however, suspicion fell on the property currently owned by the Powells, which is to the north and adjoining the HRW land.[3] A manufactured gas plant ("MGP") had been located on this site, beginning in 1907 and continuing until at least 1946. This site had been listed in a report prepared in 1985 at the behest of the United States Environmental Protection Agency ("EPA") as a former MGP. The site had also been visited by personnel from the Maryland Department of Environment, Waste Management Administration ("MDWMA").

---

1. HRW is a wholly-owned second tier subsidiary of Clark. HRW Memorandum in Support of Motion for Partial Summary Judgment on Liability, at 8.

2. "Coal-tar" is a generic term for the by-products of the manufacture of illuminating gas.

3. In fact, the property on which the MGP was situated is now owned by three separate entities: the Powells, who are plaintiffs in this suit, Wenger Associates, L.P., who are non-parties to this suit, and the Maryland Capital Park and Planning Commission, who are also non-parties to the suit.

MGP sites are of interest both to the EPA and to the MDWMA because of the potential health hazards surrounding the residue of gas production. The principal components of manufactured gas tars are polynuclear aromatic hydrocarbons and light aromatics. Long term exposure to either of these components has been linked to increased risk of cancer.

The MGP located on what is now the Powell property was first operated by the Hyattsville Gas and Electric Company ("Hyattsville Gas"), an organization which was incorporated by special act of the General Assembly of Maryland in 1906, and which began to manufacture gas from coal in the following year. In 1927, Hyattsville Gas changed its name to the Washington Suburban Gas Company ("Suburban"). In 1939, Washington Gas, the current defendants, purchased a majority interest in Suburban.

In 1946, Suburban merged with the Washington Gas Light Company of Montgomery County, Maryland, and the surviving corporation was named the Washington Gas Light Company of Maryland, Inc. ("Maryland"). In the same year, the corporation stopped production of gas at the site, and, over the next five years, it demolished the gas-making plant. In January 1952, the plant site was sold to Michael Marinelli. Mr. Marinelli in turn leased the property to the Powells, beginning in 1952. The Powells eventually purchased the property, in 1959.

In 1953, "Maryland" was dissolved, and its assets and liabilities were transferred to Washington Gas, the present defendant.

As a result of the discovery of the coal tar, HRW and the Powells claim that they have suffered expenses connected with the assessment, evaluation and monitoring of the release of the hazardous substance from the property and have sued Washington Gas under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* They claim that the expenses incurred are consistent with the National Contingency Plan, 40 C.F.R. Part 300, and are therefore recoverable costs under CERCLA. The plaintiffs have also included several state-law claims in their complaints.

Washington Gas disputes liability, by claiming that it cannot be held liable for the alleged acts of a former corporate entity and that the costs incurred by the plaintiffs were not "necessary" as contemplated by CERCLA. Furthermore, it contends that the plaintiffs are themselves liable under CERCLA, and that they have no defense to liability.

Washington Gas has also cross-filed motions for summary judgment on the various common law claims made by the plaintiffs. These will be discussed in more detail below.

## II. SUMMARY JUDGMENT STANDARD

The moving party has the initial responsibility of informing the court of the basis for the belief that summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987). Once a motion for summary judgment is made and supported, the non-moving party "may not rest upon the mere allegations or denials of [that] party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Record Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The court will grant summary judgment if there is "no genuine issue as to any material fact...." Fed.R.Civ.P. 56(c). A fact is material only if, when applied to the substantive law, the fact affects the outcome of the suit. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. A material fact is genuinely disputed only if, based on that fact, a reasonable jury could find in favor of the non-moving party. *Id.*

While the court may not weigh the evidence, it must determine whether there is

a genuine issue for trial. As the Supreme Court stated in *Liberty Lobby*, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512. *See also Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985) ("Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes.") Thus, where the record could not support a finding by the trier of fact for the non-movant, there is no genuine issue for trial and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

### III. SUCCESSOR LIABILITY

The issue of successor liability is crucial to this litigation. Clearly, if Washington Gas cannot, as a matter of law, be held liable for the alleged acts of a corporate predecessor, the plaintiffs cannot recover from it. It is, therefore, no surprise that Washington Gas has first moved for summary judgment on this issue.

### A. Federal Common Law and CERCLA

A threshold issue in determining the question of successor liability is which law applies. There is no question that a successor corporation can, under certain circumstances, be held liable under CERCLA for the acts or omissions of predecessor corporations. *United States v. Carolina Transformer Co.*, 978 F.2d 832, 837 (4th Cir.1992). The issue

revolves around what circumstances must exist before successor liability is applicable.

The United States Court of Appeals for the Fourth Circuit and Court of Appeals of Maryland law agree as to one theory of analysis of the successor liability issue. There is, however, disagreement as to a second theory, that of "continuity of enterprise," which is applicable, in the Fourth Circuit, on federal claims, but not on Maryland state-law claims, under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Although the practical effect of this disagreement between the federal and state standards for successor liability might be minimal in this case, the emphasis placed by the Fourth Circuit on the "continuity of enterprise" test in *Carolina Transformer* is such that consideration of the question of which law applies is warranted here.[4] This is especially true where, as here, the complaint has state as well as federal counts contained within it. No court in this District appears to have ruled on this issue.

▮▮▮▮ The Fourth Circuit and the Court of Appeals of Maryland both agree that the general rule is that a corporation that acquires the assets of another does not take on the liabilities of the predecessor corporation. There are, however, exceptions to this general rule which will permit recovery from a successor corporation. The first theory of recovery, called the "settled" rule by the Federal court, *Carolina Transformer*, 978 F.2d at 838, and the "traditional" rule by the Maryland court, *Nissen Corp. v. Miller*, 323 Md. 613, 617, 594 A.2d 564, 565 (1991), is stated as follows:

[A] corporation which acquires the assets of another corporation does not take the

---

**4.** The Fourth Circuit omitted an analysis of which law is applicable in the *Carolina Transformer* opinion. Rather, it cited language from a previous opinion, *United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988). In this opinion, the Fourth Circuit held: "In each case, the court must consider traditional and evolving principles of federal common law, ... which Congress has left to the courts to supply interstitially." *Monsanto*, 858 F.2d at 171, *Carolina Transformer*, 978 F.2d at 837–38. The district court in *Carolina Transformer* was somewhat more informative in its opinion, noting that CERCLA addresses overriding federal interests, thus justifying the

creation of uniform federal standards. *United States v. Carolina Transformer Co., Inc.*, 739 F.Supp. 1030, 1038 (E.D.N.C.1989), *aff'd, Carolina Transformer*, 978 F.2d at 841. (Although not mentioned by the court, North Carolina has, like Maryland, apparently *not* adopted the "continuity of enterprise" exception to successor liability. *See Budd Tire Corp. v. Pierce Tire Company, Inc.*, 90 N.C.App. 684, 370 S.E.2d 267 (1988) (only exceptions to general rule of non-assumption of liability are agreement to assume, de facto merger, fraud, or "mere continuation")). Neither federal opinion, however, raises the possible application of state law to CERCLA.

liabilities of the predecessor corporation from which the assets are acquired unless one of four generally recognized exceptions are met: (1) the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) the transaction may be considered a de facto merger; (3) the successor may be considered a "mere continuation" of the predecessor; or (4) the transaction is fraudulent. *Carolina Transformer*, 978 F.2d at 838 (citations omitted), *see also Nissen Corp.*, 323 Md. at 617, 594 A.2d at 565–66.

■ The "continuity of enterprise" exception considers a series of factors, which are set out by the Fourth Circuit as follows:

(1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in the same location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of business operations; and (8) whether the successor holds itself out as the continuation of the same enterprise. *Carolina Transformer*, 978 F.2d at 838 (citations omitted).

This exception, as predicted by this Court in *Giraldi v. Sears, Roebuck & Co.*, 687 F.Supp. 987 (D.Md.1988), was expressly rejected by the Court of Appeals of Maryland. *Nissen Corp.*, 323 Md. at 632, 594 A.2d at 573.

The language of CERCLA itself is silent as to the appropriate decisional law which should be used to interpret the statute.

Where this is the case, courts will traditionally turn first to the legislative history of the statute in attempt to glean the intent of Congress. Unfortunately, the legislative history of CERCLA gives more insight into the 'Alice-in-Wonderland'-like nature of the evolution of this particular statute than it does helpful hints on the intent of the legislature.[5] The confusion inherent within the legislative history of CERCLA is ably demonstrated by a passage from Senator Randolph's comments:

It is intended that issues of liability not resolved by this act, if any, shall be governed by traditional and evolving principles of common law. An example is joint and several liability. Any reference to these terms has been deleted, and the liability of joint tort feasors will be determined under common or previous statutory law. 126 Cong.Rec. 30,932 (1980).

Although indicating that "common law" should be used to interpret the statute, the question of *which* common law is left, unfortunately, unanswered.

Despite its questionable value, several courts have used CERCLA's legislative history to inform their decisions developing federal common law in this area. *See, i.e., Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345, 350 (D.N.J.1991) ("CERCLA's legislative history reveals that Congress intended that the courts should develop federal common law to fill in the gaps in the statute."[6]), *New Castle County*, 642 F.Supp. at

---

5. Criticizing Congress is the judicial equivalent of shooting fish in a barrel. The Court will decline the opportunity of taking what amounts here to a point-blank shot at a stationary target because Representative Harsha has already done the job:

There are numerous deficiencies as our handout demonstrates. The bill is not even drafted in a technically sound manner when you consider that we are talking about imposing a tax on industry of approximately $1.38 billion and committing the taxpayers to approximately $220 million. I think the public have a right to demand that the law be well written. But it is more than just a tax. We are establishing civil liability and criminal penalties in this legislation, and numerous questions have been raised as to what we are doing to common law with this new statute. These are not spurious issues. They are going to be litigated and the courts are going to have a field day in ridicul-

ing the Congress on passing laws that are vague, internally inconsistent, and using tools such as superseding laws which are in conflict without any further guidance. This bill is not a superfund bill—it's a welfare and relief act for lawyers. 1 *A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Superfund)*, 788–89 (1983).

6. The *Mobay* court quoted Representative Florio, the House sponsor of the bill, as stating: "[t]o insure the development of a uniform rule of law, and to discourage business[es] dealing in hazardous substances from locating primarily in states with more lenient laws, the bill will encourage the further development of a Federal common law in [the CERCLA liability] area of the law." *Mobay Corp.*, 761 F.Supp. at 350. (citations omitted). Another court has commented that, as the floor manager of the House bill then under

1267 (based on recent legislative developments, CERCLA contribution should be developed as matter of federal common law), *Smith Land & Improvement Corp. v. Celotex*, 851 F.2d 86, 91 (3d Cir.1988) (meagre legislative history indicates Congress expected courts to establish federal common law to supplement statute). In this Court's opinion, however, the legislative history of CERCLA is too slender a reed to support the weight of a determination as to the choice of appropriate law.

■ The better course is to look at the nature of the legislation itself and the desirability of uniformity of interpretation. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). When it is appropriate to adopt local standards, the federal courts can use state law, provided there is no conflict with federal statutes. *Royal Indemnity Co. v. United States*, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941) (suitable rate of interest in action at law to recover amount due from taxpayer's surety is that prevailing in state where obligation was contracted and was to be performed).

■ The purpose of CERCLA, whether articulately stated by the Congress or not, is to impose national standards in the area of liability for environmental pollution. As noted by another court, "[o]ne can hardly imagine a federal program more demanding of national uniformity than environmental protection." *In re Acushnet River & New Bedford Harbor Proceedings*, 675 F.Supp. 22, 31 (D.Mass.1987). Application of the various state laws governing successor liability in order to interpret this statute could cripple the effectiveness of CERCLA by creating a patchwork of potentially inconsistent rulings. Thus, based on the nature and purpose of the statute, federal common law should be applied in the area of successor liability under CERCLA. For this reason, the Fourth Circuit's "continuity of enterprise" test, if applicable under the facts, should be used to

assess Washington Gas' potential liability to HRW and the Powell plaintiffs.

## B. Analysis

The substantive analysis of successor liability in this case begins, as it must, with the language of the statute. CERCLA provides, in pertinent part, as follows:

> [A]ny person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for
>
> \* \* \*. \* \* \*
>
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan[.] 42 U.S.C. §§ 9607(a)(2), (4)(B) (1992)

■ For purposes of CERCLA, the term "person" includes "corporations." 42 U.S.C. § 9601(21) (1992). A "facility" has been defined as "any 'area' in and around which hazardous substances have 'come to be located.'" *Carolina Transformer*, 978 F.2d at 836, *quoting Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 842–843 (4th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992). Finally, liability under CERCLA is borne by, among others, the current owner of the facility, and any person who "owned" or "operated" the facility at the time of the disposal of any hazardous substances. *Nurad*, 966 F.2d at 841. The "operator" of the facility has been defined by the Fourth Circuit as one who has the authority to control the site and abate damage caused by the disposal of hazardous substances. *Id.* at 842. The definition includes one who had the authority to act, but declined to exercise that authority. *Id.*

Washington Gas has moved this Court for summary judgment on the issue of successor liability. It contends that it cannot be con-

consideration, Representative Florio's remarks "are deserving of substantial weight in a court's consideration of legislative history." *United States v. New Castle County*, 642 F.Supp 1258, 1267 (D.Del.1986). While this might well be

true, the Court is not convinced that the legislative history of CERCLA *itself* deserves any weight, and therefore Representative Florio's remarks are, at best, of limited value to the analysis here.

sidered as an owner or operator of the Hyattsville site.[7] Furthermore, it contends that there was no statutory merger between the predecessor corporation and itself, that the general rule excludes a successor corporation from liability, and that none of the recognized exceptions to this rule applies in this case.

### 1. *Owner or Operator*

Washington Gas claims that it cannot be considered as the owner or operator of the Hyattsville site. In support of this contention, it notes that it never owned the site. The convoluted history of ownership runs from Hyattsville, later Suburban, to Maryland, to Mr. Marinelli, and finally to the Powells. Thus, claims Washington Gas, any liability under CERCLA for the Hyattsville site belongs to Suburban, which was merged into Maryland in 1946. Maryland was liquidated and dissolved in 1953.

Furthermore, Washington Gas claims that CERCLA liability did not exist until the enactment of the legislation, long after the sale of the site. As support for this proposition, Washington Gas cites the Court to *Matter of Penn Central Transportation Co.*, 944 F.2d 164 (3d Cir.1991). Thus, alleges Washington Gas, the 1953 liquidation extinguished any potential liability which otherwise might have accrued to it.

■ The comfort Washington Gas draws from the *Penn Central* opinion is illusory. Despite Washington Gas' attempts to stretch the case into fitting the proposition that retroactive application of CERCLA is unwarranted, the plain language of the Third Circuit will not support this interpretation: "[I]n 1980 Congress passed CERCLA, which imposed retroactive liability on *both present and past owners* of facilities where hazardous substances ... are being or have been re-

leased...." *Penn Central*, 944 F.2d at 166 (emphasis supplied). Indeed, the *Penn Central* court noted that the parties in that case did not dispute the retroactive nature of CERCLA, citing to *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 732–33 (8th Cir.1986). In this case, the Eighth Circuit engaged in a detailed analysis of the retroactivity of CERCLA, ultimately concluding that "it is manifestly clear that Congress intended CERCLA to have retroactive effect." *Id.* at 732–33. This Court agrees with the proposition that CERCLA liability can attach retroactively, and therefore Washington Gas' position as to this issue is not persuasive.

■ Washington Gas' other contention need not long trouble the Court. Briefly stated, Washington Gas argues that because *it* never owned the Hyattsville site, no liability should accrue to it. Were this simplistic position in fact the law, any corporate entity could avoid successor liability under CERCLA by simply reforming itself at regular intervals. The question, rather, is whether liability which may or may not have accrued to any of Washington Gas' *predecessors* has been passed on to Washington Gas. The fact that *this* corporate entity never owned the site is irrelevant. Thus, Washington Gas' position as to the absence of liability predicated on its lack of ownership of the property is unpersuasive, and it does not support its motion for summary judgment.

### 2. *Statutory Merger*

■ Washington Gas next contends that, because there was no statutory merger in this case between Washington Gas and Maryland, there can be no liability. As support for this proposition, Washington Gas cites the Court to *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir.

---

**7.** The definition of "operator" has been extended by courts to impose liability on parent corporations for the actions of subsidiaries. *See United States v. Kayser–Roth Corp.*, 910 F.2d 24 (1st Cir.1990), *Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345, 352–54 (D.N.J.1991) (and cases cited therein). Before the 1953 transaction, Maryland was a corporation which was 99.9% owned by Washington Gas. Thus Washington Gas could conceivably be considered an 'operator' of

the Hyattsville site. The plaintiffs in this case, however, mention this theory of recovery only fleetingly in a footnote. HRW Plaintiff's Motion for Partial Summary Judgment on Liability, at 39 n. 29. HRW fails to meet its burden of proof with regard to this issue, however, making only generalized claims about the amount of control exercised by Washington Gas over Maryland, which are insufficient to sustain summary judgment.

1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989), said by Washington Gas to be the "leading case" on successor liability under CERCLA. Memorandum in Support of Motion for Summary Judgment as to Successor Liability, at 7.

This argument is irrelevant to the Court's consideration. Without analyzing the substance of the *Smith* holding, it is sufficient to note that *Carolina Transformer,* the leading case on the issue in *this* Circuit, provides several alternative methods for determining potential successor liability. Although it is true that there was no statutory merger here, that fact does nothing to support the defendant's motion for summary judgment in light of *Carolina Transformer.*

### 3. *Exceptions to the General Rule of Non–Liability*

As noted above, the general rule is that a successor corporation cannot be held liable for the action or inaction of its predecessors unless one of four exceptions to the rule applies.[8] For ease of analysis, the Court will examine each of these exceptions in turn.

#### i. *Fraud*

■ Where a transaction was fraudulently entered into for the purpose of escaping liability, the court can hold the successor corporation liable for the acts of the predecessor. *Carolina Transformer,* 978 F.2d at 838. A brief glimpse at the chronology of this case confirms that fraud is not at issue here. It would have taken clairvoyant powers for Washington Gas somehow to have structured the transaction with Maryland in order to avoid liability under a statute that would not be enacted for almost thirty years, and the mere idea of which, in an era of limited federal rule, would have been ridiculed by any sane lawyer.

#### ii. *Mere Continuation*

■ The substance of this exception, as opposed to the "continuity of enterprise" ex-

ception discussed earlier, is as follows: "[A] corporation is not to be considered the continuation of a predecessor unless, after the transfer of assets, only one corporation remains, and there is an identity of stock, stockholders, and directors between the two corporations." [9] *Carolina Transformer,* 978 F.2d at 838, *citing Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168, 175 (5th Cir.1985). Washington Gas contends that there was no continuation of business between the two corporate entities, and that therefore no continuation of business can be said to have occurred. Furthermore, Washington Gas contends that there is no identity of officers, stockholders or directors between the two corporations, and that therefore the test for mere continuity is not met.

#### a. *Continuation of Business*

Although not part of the test for mere continuity as set out above, the question of whether there is continuation of business between a predecessor and successor corporate entity does have a common-sense flavor about it, when analyzing the fact of continuity between predecessor and successor corporations. Washington Gas notes that the predecessor corporation in this case manufactured gas, while the successor did not, and that therefore there was no mere continuation of business. Washington Gas, Memorandum, at 15. This contention is disingenuous at best.

In this case, Maryland's business was the "distribution of gas for ultimate consumption in areas in Maryland adjoining the District of Columbia . . . ." Memorandum of Recommendations Re Elimination of Maryland Subsidiaries of Washington Gas Light Company, Washington Gas Memorandum, Appendix 4, at 2. Immediately prior to the merger, Washington Gas was "engaged in the purchase, storage, transportation in interstate commerce, sale for resale and distribution for ultimate consumption of gas." *Id.* at 1. Indeed, immediately prior to the merger, Ma-

---

8. The fifth exception, "continuity of enterprise," is, as discussed above, available for discussion in this case. Because of the Court's ruling, *infra,* an analysis of this exception is unnecessary here.

9. Thus the test is *not* whether the old and new corporations share "identical officers, directors and shareholders" Washington Gas Memorandum, at 15, as Washington Gas would have the Court believe.

ryland, Washington Gas, and two Virginia based subsidiaries of Washington Gas formed "an integrated system for the supply of gas to the metropolitan area of the City of Washington." *Id.* at 2.

There is no indication that supplying gas to the Washington metropolitan area did not continue to be Washington Gas' business after the merger. Indeed, although Washington Gas was involved in some other activities, it is clear from the Annual Report for fiscal year 1953, appended to Washington Gas' Memorandum as Appendix 6, that sale of gas was the principal business of the company.[10]

This Court therefore finds that both predecessor and successor corporations were in the business of supplying gas to consumers. Because of this finding, the Court holds that there was continuation of business between the two corporate entities.[11]

### b. *Identity of Stockholders* [12]

Washington Gas claims that there is no identity of stockholders between Maryland and Washington Gas, thus there should be no finding of a 'mere continuation' of business between the predecessor and successor corporations. Washington Gas' reason for this claim is that the minority shareholders of Maryland did not participate in the 1953 merger.

The majority shareholder of Maryland was Washington Gas. It held 299,716 out of 300,000 shares of capital stock (approximately 99.9%). Washington Gas Memorandum, Ap-

pendix 4, at 1. The identity of the Washington Gas shareholders is not known. What is known is that the stockholders of the two corporations were not identical, since Washington Gas was not its own principal shareholder.

It is not as clear as Washington Gas would wish to believe, however, that mathematical precision is what the test requires. Washington Gas seeks to interpret "identity" as meaning "identical." The Court prefers the dictionary definition: "sameness of essential or generic character in different instances." *Webster's Ninth New Collegiate Dictionary* at 597 (1st ed. 1986). This definition would allow for some variation as long as the essential character is the same. In particular, the underlying rationale for this test—control over first one organization and then the other by the same group of stockholders—is clearly met here. Although there is no information provided as to the identity of the Washington Gas stockholders, it is clear that these stockholders controlled the pre-transaction affairs of both Washington Gas and its virtually wholly-owned subsidiary, Maryland.

It is not necessary, however, for the Court to base its analysis on semantic interpretation. It is clear from the memorandum of recommendations concerning the elimination of Maryland that the existence of minority shareholders might have complicated the proposed dissolution. Therefore, Washington Gas' plan was to eliminate the minority interest in Maryland before dissolving the corporation. *Id.* at 4. Indeed, the memo-

---

10. Sale of gas in 1953 accounted for $33,307,400. All other sources of income totalled $129,000.

11. Washington Gas' claims that Maryland's business was the manufacture of gas, and that manufacturing of gas ceased "as a result of" the 1953 merger of Washington Gas and Maryland (Washington Gas Memorandum, at 13) are contradicted by earlier claims that the manufacture of gas at the Hyattsville plant ceased in 1946. *Id.* at 4. Of course, it is possible that production stopped at one plant in 1946, and continued at other plants until 1953, but there seems to be no indication that Maryland owned or operated any other gas production facilities. In either event, the point is irrelevant. Even if Maryland did produce gas until 1953, and, in fact, even if Washington Gas had continued the production after the merger, such production would have

constituted merely a step in the process towards the ultimate goal of both companies, which was supplying gas for consumers. Only if Maryland had been *principally* a producer of gas, and Washington Gas principally a supplier, could Washington Gas' argument prevail. The facts in this case simply do not support such a conclusion.

12. The issue of identity of stock is not addressed by Washington Gas, apparently because of its misreading of the language of *Carolina Transformer*. Nor is this issue raised by either of the plaintiffs, though their reasons for omitting an analysis are less clear. Because of the parties' failure to discuss this issue, and because the analysis is not pivotal to the Court's holding in this matter, the Court will refrain from a *sua sponte* discussion.

randum outlines in some detail two alternative means of accomplishing this goal, one involving the purchase of the minority shares by Washington Gas, and one involving the purchase of the shares by Maryland. *Id.* at 10–13.

The documents supplied as exhibits to the Court are not specific about what happened next. What is clear, however, is that something did indeed occur. Exactly one year after the memorandum of recommendations was dated, on September 17, 1952, Washington Gas refers to itself as the *sole* stockholder of Maryland. HRW Exhibit F–6, at 89. Furthermore, when the vote to dissolve Maryland was taken on July 23, 1953, the 299,716 votes of Washington Gas are described as being "the entire issued and outstanding shares of capital stock of the Washington Gas Company of Maryland, Inc." *Id.* at 123. It would therefore appear that Washington Gas took the advice of its counsel and had Maryland negotiate with the minority stockholders, and either retire or hold in the treasury the 284 minority shares.

Washington Gas was therefore the single shareholder of Maryland at the time of the dissolution. There were no minority shareholders to participate in the 1953 transaction. Thus, prior to the time of the 1953 transaction, the same shareholders controlled the affairs of both Maryland and Washington Gas. After the transaction, the same shareholders controlled the affairs of Washington Gas. This constitutes sufficient continuity for the Court to hold that there was identity of stockholders between the predecessor and successor corporations in this case.

### c. Identity of Directors

Washington Gas cites the Court to the 'Washington Gas Light Company Annual Report For The Year Ended Dec. 31, 1953,' and to the 'Washington Gas Light Company of Maryland, Inc. Articles of Dissolution,' for proof of the proposition that there was no identity of directors between the two corporations.

In fact, according to these documents, all but two of Washington Gas' directors were also directors of Maryland.[13] Although not part of the test, it is also interesting to note that *all* of Washington Gas' principal officers were also officers of Maryland.[14] This information does nothing to diminish the possibility of a finding of 'mere continuation' between the predecessor and successor corporation.

### iii. Assumption of Liability

The third exception to the general rule of non-successor liability is that of assumption of liability. If the successor corporation affirmatively assumes the liabilities of its predecessor, then clearly it can be held liable for that which the predecessor could be held liable.

Washington Gas admits that at the time of the 1953 transaction, it assumed the liabilities of Maryland. Indeed, the articles of transfer are quite explicit on this point:

The Transferee Corporation [Washington Gas], effective upon such transfer, will assume all liabilities and obligations, liquidated or unliquidated, of the Transferor Corporation [Maryland] to persons other than the Transferee Corporation. The necessary steps will be taken to extinguish all indebtedness of the Transferor Corporation to the Transferee Corporation.

---

**13.** The Washington Gas' directors are listed as: Albert W. Atwood, Everett J. Boothby, Gardner L. Boothe, Ashton C. Jones, E.K. Morris, Howard B. Noyes, Christopher H. Pope, Sidney F. Taliafero, and Corcoran Thom. Appendix 6, Washington Gas Report for 1953, at 1. The Maryland Directors are listed as: Albert W. Atwood, Everett J. Boothby, E.K. Morris, Howard B. Noyes, Christopher H. Pope, Sidney F. Taliafero and Corcoran Thom. Appendix 5, Articles of Dissolution, at 1–2. Thus only Messrs. Boothe and Jones are present on the Washington Gas board but missing from Maryland's.

**14.** The Washington Gas officers are given as follows: Everett J. Boothby, Howard B. Noyes, Otis H. Ritenour, Donald S. Bittenger, Carrol C. Pike, Edward T. Stafford, Wylie W. Barrow and C. Oscar Berry. Appendix 6, Washington Gas Report for 1953, at 1. The Maryland officers are listed as: Everett J. Boothby, Howard B. Noyes, Otis H. Ritenour, Donald S. Bittenger, C. Oscar Berry, Edw. T. Stafford [sic], Carroll C. Pike, Wylie W. Barrow and Hazel G. Thompson. Appendix 5, Articles of Dissolution, at 2. Thus only Ms. Thompson, who appears as the Assistant Secretary of Maryland but not on the list of officers of Washington Gas, is different.

HRW, Appendix F–6 to Motion for Partial Judgment on Liability, at 313.

Washington Gas claims, however, that this agreement does not, indeed, cannot, apply to CERCLA liability, which appears for the first time almost forty years after this transaction. Moreover, it claims that, because the land which is the subject of this litigation was no longer even in the possession of Maryland at the time of the transaction, there can be no question of liability.

The defendant's position is weakened by the Court's finding *ante* that CERCLA does apply retroactively. Consistent with that earlier finding, the Court finds that the retroactive nature of liability here will not prevent successor liability from being established.[15]

The defendant's other contention, that there can be no successor liability here because Maryland did not own the Hyattsville site at the time of the transfer, is also not persuasive. Had Maryland sold the Hyattsville site, but had kept going as a viable corporation rather than subsequently dissolving, and had there come a time when the pollution was discovered and proved to have been caused by Maryland, then, under CERCLA, Maryland would be held liable. CERCLA is unequivocal about holding responsible "any person *who at the time of disposal* of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a) (emphasis supplied). This result would obtain even though the pollution occurred nearly forty years before. The pollution at the Hyattsville site would have been held as a liability of Maryland had it survived, albeit an unliquidated one in 1953. In that Washington Gas assumed all liabilities, liquidated and unliquidated, of Maryland at the time of the transfer, liability can now be asserted against Washington Gas. Neither

passage of time nor *post hoc* transfer of ownership to another party can alter Maryland's, and therefore Washington Gas', potential liability in this matter.

Washington Gas finally argues that it cannot be held to liabilities which it could not know about, such as CERCLA liability, because they did not exist at the time of the transfer. The theory behind this argument is that, because CERCLA liability could not even have been contemplated at the time of the transfer, Washington Gas could not have assumed it.

Unfortunately for Washington Gas, there is no qualifying language in the Articles of Transfer which lends weight to this proposition. Although the defendant again brings out *Penn Central* in an attempt to bolster its position, the Court is no more convinced by the defendant's citation to the case here than it was previously. A simple reading of *Penn Central* makes it clear that the retroactive nature of liability under CERCLA was contemplated and accepted by the court and the parties in that case.

Indeed, the case law on this issue goes against Washington Gas' position. *See, Purolator Products Corp. v. Allied–Signal, Inc.,* 772 F.Supp. 124, 132 (W.D.N.Y.1991) ("Although parties could not be expected to have foreseen CERCLA before it was enacted, an agreement which is broad enough to encompass any and all claims ... has been held to cover CERCLA liability.") (citations omitted), *In re Hemingway Transport, Inc.,* 126 B.R. 650 (D.Mass.1991) (In determining whether to recognize an assumption of CERCLA liability, "[t]he better approach is that which allows broad, unambiguous transfers of liability to stand in those cases where the intent of the parties is clear").

Washington Gas might seek solace in the *Mobay* opinion, in which the court held that "in order for the Court to interpret a con-

---

**15.** Indeed, there is even a question as to whether it is correct to speak in terms of 'retroactive liability' for purposes of CERCLA. As noted by the Court in *United States v. South Carolina Recycling & Disposal, Inc.,* 653 F.Supp. 984, 20 Env't Rep.Cases (BNA) 1753 (D.S.C.1984), *cited by, Northeastern Pharmaceutical,* 810 F.2d at 733 n. 4, CERCLA does *not* impose liability for past conduct. Rather, it imposes liability on those responsible for conduct which causes present or future danger to the environment. It is the present or future results of the past actions which are actionable under CERCLA, not the past actions themselves, and therefore the liability itself is not retroactive. Intriguing though this point might be, however, it does not affect the analysis of successor liability in this case.

tract as transferring CERCLA liability, the agreement must at least mention that one party is assuming environmental-type liabilities." *Mobay Corp.,* 761 F.Supp. at 358. The language of the assumption agreement in *Mobay,* however, was much more specific than in the present case.[16] As the *Mobay* court noted: "Although a contract containing a broadly-worded clause, waiving all liabilities of *any* type whatsoever, is not involved in this case, the Court would expect that such a contract would also constitute a waiver of CERCLA liability." *Id.* at 358 n. 15 (emphasis in original). The *Mobay* court therefore seems to have been more concerned with the fact that the agreement in that case was specific in some matters, but yet did not address environmental issues. Had the agreement been extremely broad, as it is in this case, it is possible that the *Mobay* court would have held it sufficient to assume all liabilities, including CERCLA liability. Even should this not be the case, however, the two cases are sufficiently distinguished for the *Mobay* holding to be unpersuasive here. Thus the failure of Washington Gas to make an express adoption either of specific CERCLA type, or general environmental, liability will not bar a finding of successor liability in this case.

### iv. *De Facto Merger*

Washington Gas claims that there was no de facto merger here. As justification for this position, Washington Gas points to the failure of the facts of this case to conform to the test set out by other courts to determine whether or not a de facto merger has occurred.

The test for a de facto merger has been summarized as follows:

(1) continuity of management, personnel, physical location, assets, and general business operations (i.e., continuity of enterprise); (2) continuity of ownership; (3) prompt cessation of the seller corporation's operations; and (4) assumption by the purchaser of obligations ordinarily necessary for the uninterrupted continuation of normal business operations of the seller. *Crawford Harbor Assoc. v. Blake Const. Co., Inc.,* 661 F.Supp 880, 884 (E.D.Va. 1987) (footnote omitted).[17]

Because the theory of de facto merger is equitable in nature, no one of these factors alone is sufficient to establish successor liability, nor does the absence of just one of these factors disqualify a finding of successor liability. *Acushnet River,* 712 F.Supp. at 1015.[18]

### a. *Continuity of Enterprise*

As noted above, the business engaged in by Maryland and Washington Gas was the distribution of gas in the Washington, D.C. metropolitan area. Once the 1953 transaction was effectuated, this continued to be the business of the successor corporation. There

---

16. The relevant language of the assumption agreement in *Mobay* was as follows:

"[Successor will indemnify predecessor for] ... all obligations and liabilities relating to the Haledon Plant or Haledon Products arising out of claims made, or suits brought, on or after the Closing Date for (i) injury, sickness, disease or death of any person, or (ii) any damages to any property, in either case which is ultimately determined by the finder of fact to have resulted from any condition existing, substance consumed or discharged, product manufactured or action taken or omitted (such conditions, substances, products and action being hereinafter in this Section 3 called 'Causes') on or after the Closing Date, whether or not such cause existed prior to the Closing Date...." *Mobay Corp.,* 761 F.Supp. at 355.

17. This test for a de facto merger is, in fact, extremely similar to the test set out by the Fourth Circuit in *Carolina Transformer* for "continuity of

enterprise." *See, supra.* Indeed, the similarity of these two tests has prompted one court to refer to the difference between them as "more apparent than real." *In re Acushnet River,* 712 F.Supp. at 1019 n. 15. Although the *Acushnet River* court referred to the test as being similar to the "mere continuation" standard, the court makes it clear in its description that it is referring to what has been called here the "continuity of enterprise" test.

18. This fact notwithstanding, the *Crawford Harbor* court found that the most critical element in the above analysis is continuity of ownership. "The essential characteristic of a de facto merger is the succession of the selling corporation's stockholders to stockholder status in the purchasing corporation." *Crawford Harbor Assoc.,* 661 F.Supp. at 884, *quoting* Yamin, *The Achilles Heel of the Takeover: Nature and Scope of Successor Corporation Products Liability in Asset Acquisitions,* 7 Harv.J.L. & Pub.Pol'y 185, 231 (1985).

was, in large degree, continuity of directors. There was complete continuity of officers. Washington Gas argues that the employees of Maryland were transferred to other locations. Washington Gas, Memorandum at 13. This is not the issue. The question is whether the employees of the predecessor corporation became employees of the successor corporation, and the answer in this case is that they did.

It is true that the location at which these activities occurred was different, since the Hyattsville site was sold to Mr. Marinelli. All other components of the continuity of enterprise portion of this test, however, are met.

### b. Continuity of Ownership

Again, as described above, Washington Gas took pains to eliminate the minority stockholders of Maryland prior to the 1953 transaction. Thus at the time of the transaction, the stockholders, or owners, of Washington Gas effectively controlled both corporations. They continued to control Washington Gas after it became the successor corporation. Therefore there was continuity of ownership in this case, and the requirements of this portion of the test, referred to by the *Crawford Harbor* court as the most critical of the four, are met.

### c. Cessation of Seller's Operations

Washington Gas admits that Maryland ceased to operate as part of the 1953 transaction. It notes that this was a logical and necessary step, because Maryland was a manufacturer of gas, while the new corporation was merely a distributor. This argument is both incorrect, for reasons analyzed above, and irrelevant. The reasons for the cessation of the predecessor corporation's operations are not important—merely the fact that it *did* cease to operate is sufficient. Because Maryland did indeed cease operations, this wing of the test is satisfied.

### d. Assumption by the Purchaser of Obligations Necessary for Business

The last branch of the test requires that the successor corporation assume all obligations ordinarily necessary for the uninterrupted continuation of the predecessor's business. Washington Gas argues that this branch of the test is inapplicable, because the predecessor's business—the manufacture of gas—was not the business of the successor corporation.

Under the plan of liquidation, entered into by Washington Gas and Maryland on July 31, 1953, Washington Gas agreed to assume all liabilities and obligations of Maryland, as well as agreeing to "assume, perform and carry out all of the contracts of [Maryland] and in every respect to fulfill all of its duties and obligations." Powell Memorandum, Exhibit 4, at 305.

Furthermore, one of the issues raised in the memorandum of recommendations concerning the elimination of Maryland, prepared for Washington Gas, concerned the action which Washington Gas should take in order to secure authority to continue operations in certain territory then controlled by Maryland. This question was deemed to be of "great importance" which should be given "prompt consideration" by counsel. Washington Gas Memorandum, Exhibit 4, at 22.

Maryland had the right to distribute gas in Hyattsville, Chevy Chase, Takoma Park and other areas of Prince George's and Montgomery Counties. In order to retain the rights to distribute gas in these areas, Washington Gas and Maryland were advised to seek approval from the Maryland Public Service Commission for their transfer. This permission was sought and obtained. The decision of the Maryland Public Service Commission was then challenged by Montgomery County, and this challenge was dismissed by the Court of Appeals of Maryland. *Montgomery County v. Public Ser. Comm.*, 203 Md. 79, 98 A.2d 15 (1953). Thus Washington Gas obtained the rights to distribute gas in the areas in which gas was previously distributed by Maryland. This result was confirmed in the articles of transfer, in which all franchises of Maryland were transferred to Washington Gas. HRW Memorandum, Exhibit 6, at 313.

The assumption by Washington Gas of all of Maryland's contracts can therefore be

seen to have more than merely formal significance. Clearly, the rights Maryland owned to distribute gas in Montgomery and Prince George's Counties were significant to Washington Gas. Washington Gas' general assumption of all Maryland's contracts, contained within the liquidation plan, combined with its successful attempts to retain specific distribution rights in certain geographic areas, convince this Court that the final branch of the de facto merger test is met in this case.

### e. Other Considerations

There are several other miscellaneous factors raised by the parties which, although not strictly part of the test to determine whether a de facto merger has occurred, could have a bearing on the analysis.

The first of these factors is the intent of the parties. In the memorandum of recommendations prepared in anticipation of the 1953 transaction, it is clear that the merger of the two corporations was considered, but was deemed "inadvisable" given the necessity of seeking express legislative authorization which, in all probability, would not be forthcoming. Washington Gas, Memorandum, Exhibit 4, at 2–3. In that a de jure merger was not possible, Washington Gas then considered other options by which the same result could be achieved, one being the transaction that ultimately occurred in 1953. The intent of the parties, therefore, seems to have been to effect a merger, either de jure or de facto.

The plaintiffs also raise the tax implications of the 1953 transaction. The court in *Acushnet River* found that, where the parties were obliged to obtain an opinion letter stating that the transaction was a tax-free reorganization within the contemplation of the Tax Code, such a transaction should be considered as a de facto merger. *In re Acushnet River*, 712 F.Supp. at 1018–19. In the case currently before this Court, the tax implications of the transaction were prominent in the thinking of the parties. The initial memorandum outlining the structure of the transaction recommended that a ruling be sought from the Bureau of Internal Revenue to the effect that there should be no

adverse tax consequences accruing to Washington Gas as a result of its absorption of Maryland. Washington Gas Memorandum, Exhibit 4, at 4. Such a ruling was, indeed, sought and received. HRW Memorandum, Exhibit 6, at 87. In the words of the *Acushnet River* court, the tax treatment in this case "militates in favor of finding a de facto merger." *In re Acushnet River*, 712 F.Supp. at 1018.

The final miscellaneous factor raised by the plaintiffs is a social policy issue. They argue that a transaction that is structured as an asset sale should be considered as a de facto merger, under social policy considerations regarding loss spreading. As authority for this position, both the HRW and Powell plaintiffs cite the Court to *Knapp v. North American Rockwell Corp.*, 506 F.2d 361, 370 (3d Cir.1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975).

Given the plethora of information presented by the plaintiffs, it is possible for the Court to decide the de facto merger issue based on the facts of this case. The Court, therefore, sees no need to engage in an analysis of such an amorphous issue and declines the plaintiffs' invitation to decide that a de facto merger occurred here based on "social policy" considerations.

### C. Conclusion

 Based on the above analysis, the Court is of the opinion that Washington Gas can be held liable as a successor corporation to Maryland. As noted above, Washington Gas can, and should be, considered as an owner or operator of the Hyattsville property which is at issue in this case. Moreover, the absence of a statutory merger will not bar recovery here.

As discussed above, fraud is not at issue in this case. However, the undisputed facts do support the finding that Washington Gas, after the 1953 transaction, was, at least in part, a "mere continuation" of Maryland's business. Furthermore, Washington Gas unequivocally assumed the liabilities of Maryland in the articles of transfer. Finally, the facts of this case clearly support a finding that the 1953 transaction between Washing-

ton Gas and Maryland was a de facto merger.

For the above-stated reasons, Washington Gas' Motion for Summary Judgment as to Successor Liability will be, by separate order, *denied.* Furthermore, to the extent that the HRW plaintiffs' Motion for Partial Summary Judgment on Liability and the Powell plaintiffs' Motion for Partial Judgment on Liability encompass the issue of successor liability, these motions will be, by separate order, *granted.* These holdings apply both to the CERCLA claims of the plaintiffs and to the common law counts contained within the complaint. Because the Court did not need to engage in a formal analysis of the "continuation of enterprise" standard (which, as noted above, has not been accepted by the Maryland courts), the above analysis is equally applicable to the state-law counts of the complaint.

## IV. LIABILITY

Having determined that Washington Gas *can* be held liable under CERCLA, the Court now moves to the issue of whether it *should* be so held. Both the HRW and the Powell plaintiffs have moved for partial summary judgment on liability. Washington Gas has opposed these motions and has cross-moved for summary judgment on the same issue. The plaintiffs have opposed Washington Gas' motion, and both sides have replied to the various oppositions.

Once again, the Court turns to the statute to begin the analysis. Liability under CERCLA is determined pursuant to the statute, which provides, in pertinent part, as follows: "[A]ny person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for ... any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(2), (4)(B) (1992). The Court will analyze each of the elements required for liability under CERCLA, but for convenience's sake, these elements will be treated in an order different to that set out in the statute.

### A. Person

The statute provides for liability if the owner or operator of a facility is a person. Under the statute, a "person" is defined as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21) (1992).

Washington Gas clearly falls within this definition, as do HRW and the Powells. All parties to this litigation are therefore "persons" as contemplated by CERCLA.

### B. Owned or Operated

As discussed *supra,* Washington Gas was an owner and operator of the Hyattsville site. The Powells are now the owners and operators of the relevant portion of that site. HRW owns and operates its own site, which adjoins the property currently owned by the Powells, and previously owned and operated by Washington Gas. Neither the Powells nor HRW disputes this. All parties, therefore, are owners and operators within the contemplation of the statute.

### C. Hazardous Substance

Pursuant to the definition in CERCLA, a hazardous substance is:

(A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under, or listed pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act, and (F) any immanently hazardous chemical substance or mixture with respect to which the Administrator has taken ac-

tion pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquified natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas). 42 U.S.C. § 9601(14) (1992).

The substance at issue in this case is commonly called "coal-tar." The principal constituent elements of coal-tar which have been located on the land owned by HRW, as well as the land now owned by the Powells and previously owned by Washington Gas, are polycyclic aromatic hydrocarbons and include "naphthalene, 2–methylnaphthalene, acenaphthene, fluorene, phenanthrene, fluoranthene, anthracene, and pyrene." HRW Memorandum, Exhibit A 1, at 30.

▆▆▆ There is no dispute between the parties that these are hazardous substances as contemplated by CERCLA. Indeed, it is well established that constituent elements of coal-tar are hazardous substances for CERCLA purposes. *See, i.e., United States v. Union Gas Co.,* 586 F.Supp. 1522, 1523 (E.D.Pa.1984) (acenaphthene, pyrene, naphthalene, and fluoranthene are all hazardous substances under CERCLA.) *See, also,* 40 C.F.R. § 302.1 *et seq.* (designates all substances listed above as hazardous substances under CERCLA, with exception of 2–methylnaphthalene.)

In addition to these substances, Washington Gas claims that there are other hazardous substances located in the soil of the property at issue in this case. These substances, tetrachloroethane, acetone, and methylene chloride, are not constituent elements of coal-tar, nor are they by-products of the gas-making process. Washington Gas, Memorandum at 10, and Ex. 5, ¶ 3. Again, there appears to be no dispute that these

substances are indeed hazardous for the purposes of CERCLA. 40 C.F.R. § 302.1 *et seq.*

D. Facility

Under CERCLA, a "facility" is:

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

It is clear from this definition that the former Washington Gas property, now owned by the Powells, is a "facility" as contemplated by CERCLA, as it is a site where hazardous substances have come to be located. Furthermore, it is also apparent that the HRW property is also a "facility" under CERCLA's extremely broad definition of that term, since it is also a site where "hazardous substances" were stored. HRW, Memorandum in Opposition to Washington Gas' Cross–Motion, at 3 ("Products containing acetone and methylene chloride were kept at the HRW property. . . ."). Therefore, both the Powell site and the HRW site are "facilities" within the contemplation of CERCLA.

E. Disposal

The term "disposal" in CERCLA, § 9607(a)(2), is defined as having the meaning provided in the Solid Waste Disposal Act. 42 U.S.C. § 9601(29). In that act, the term "disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3) (1983).[19] "Environment" is

---

19. Interestingly, the definition of the term "hazardous waste" in the Solid Waste Disposal Act is considerably broader than that of "hazardous substance" in CERCLA. It provides that hazard-

ous waste is "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—(A) cause, or significantly

defined in pertinent part by CERCLA as being: "[A]ny ... surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States." 42 U.S.C. § 9601(8) (1992).

■ There is no dispute that the various chemicals, both the constituent elements of coal-tar and the tetrachloroethane, acetone, and methylene chloride, found on the HRW site and the land currently owned by the Powell plaintiffs are hazardous substances under CERCLA. The Court is convinced that these chemicals also constitute "hazardous waste" under the definition supplied in the Solid Waste Disposal Act. Furthermore, there is no question that the coal-tar constituent elements have entered the environment, as defined by the statute, and that their presence indicates a "disposal" pursuant to the statute.

■ Disposal may occur without any volitional human participation. *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837 (4th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992). All that is required is that the hazardous substance has been released into the environment at some point during a party's control of the facility. It is undisputed that Washington Gas' corporate predecessor was in some way involved with the disposal of hazardous substances. Indeed, Washington Gas has admitted as much in its pleadings. ("[T]he activities *that produced the contamination* had ceased ..." Washington Gas, Memorandum in Support of Motion for Summary Judgment as to Successor Liability, at 16, (emphasis supplied)). Furthermore, the absence of any requirement of human participation means that HRW and the Powell plaintiffs may be held liable for the disposal of hazardous waste, in the absence of a suitable defense or failure of Washington Gas to prove another *prima facie* element under the

liability analysis, even if they did nothing personally to contribute to the disposal.

Washington Gas, however, contends that HRW and the Powell plaintiffs were active in the disposal of the coal-tar hazardous wastes. It suggests that both plaintiffs achieved the active disposal of hazardous wastes by performing construction, grading and filling, and, in the case of HRW, using hazardous substances in their operations on the site which had some of the same constituent elements as coal-tar. Washington Gas acknowledges that not all of the contamination could have occurred from HRW's activities. It suggests, however, that it is "probable" that some did. Washington Gas, Memorandum, at 9–10.

Washington Gas' contention is simply too speculative. A mere "probability" is not enough to throw the issue into doubt for purposes of summary judgment, even were it the case that *any* contamination from HRW's activities was "probable." In fact, Washington Gas' contention that at least some of the coal-tar contamination found in the ground of the property was probably caused by HRW is precisely the "metaphysical doubt as to the material facts" which *Matsushita* warns is insufficient to raise a genuine issue. *Matsushita Electric Industrial Co.,* 475 U.S. at 586, 106 S.Ct. at 1355.

Nor can the Court accept the assertion that the activities of HRW and the Powell plaintiffs constitute an active disposal of hazardous substances. Although the defendant cites the Court to *Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1572–73 (5th Cir.1988), this citation is not persuasive. That case stands for the proposition that current owners of property *can* be held liable for the disposal of hazardous substances—a point which is not here in dispute. The case also stands for the proposition that "disposal" of hazardous waste *can* occur after hazardous materials are placed

contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, or transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5). Because it is this definition which is subsumed within the defini-

tion of "disposal," which, in turn, is adopted *in toto* by CERCLA, the Court notes with interest, but in passing, the potential for conflict inherent within these two very different definitional statements. For a more complete discussion *see, CP Holdings, Inc. v. Goldberg–Zoino & Associates,* 769 F.Supp. 432, 436–37 (D.N.H.1991).

into the ground, for example when the materials are "moved, dispersed, or released during landfill excavations and fillings." *Id.* at 1573.

What *Tanglewood East Homeowners* does not stand for, however, is the proposition for which the defendants cite it—namely, that the current owner of property *must* be found liable of disposing of hazardous materials if it has, however unwittingly, "probably" disturbed hazardous material, which was placed into the ground without its knowledge, during landfill and grading. Such a result would fly in the face of the clear intent of CERCLA. Any present landowner, as well as all other intermediate landowners, who discovered hazardous waste placed on its land by some distant previous owner could, by application of the defendant's logic, be held liable under CERCLA and compelled to share in the expense of cleaning up the land. This, according to the defendant, would be the result even if the landowner's only act was the moving about of land with no reason to think the act was unsafe. This result would surely act as a disincentive to current landowners to report the pollution of land and begin the process of voluntary clean-up.

. That this result was not the intent of Congress is shown by the inclusion of the 'innocent landowner' defense to liability under § 9607(a), which the Court will discuss below. Furthermore, the Fourth Circuit anticipated, and rejected, almost this very argument in *Nurad.* The court observed that analyzing the term "disposal" as requiring an active component was logically unsound, since it might introduce "the anomalous situation where a current owner . . . who never used the storage tanks could bear a substantial share of the cleanup costs, while a former owner who was similarly situated would face no liability at all. A CERCLA regime which rewards indifference to environmental hazards and discourages voluntary efforts at waste cleanup cannot be what Congress had in mind." *Nurad,* 966 F.2d at 845–46.

There is also the question posed by the acetone, methylene chloride, and tetrachloroethane alleged by Washington Gas to be present in the ground underneath the HRW property. Washington Gas' expert, Mr. John

A. Quagliotti, Jr., claims to have discovered acetone, methylene chloride, and tetrachloroethane in the soil and/or groundwater of the HRW and Powell properties. Washington Gas, Memorandum, Exhibit 5, at 2. The chart accompanying Mr. Quagliotti's affidavit, however, indicates that the numerical value assigned to the milligrams per kilogram measurement used to indicate the presence of these substances is an estimated quantity. Washington Gas, Memorandum, Exhibit 5, Appendix B. HRW therefore questions the very existence of these substances, arguing that because the values are so small that the amounts have to be estimated, there is a possibility that the substances may not even be present in the soil at all.

Washington Gas, in its reply, takes the position that the designation of an estimated quantity of acetone, methylene chloride, and tetrachloroethane means only that the concentration of the substances is in doubt, not the fact that they are present in the soil. Furthermore, it argues that *amount* is not an issue under CERCLA. The only question, for purposes of determining a disposal of the substances, is whether they exist in the soil.

The Solid Waste Disposal Act's definition of "disposal" encompasses the placing of *any* solid waste or hazardous waste into the environment. There is no question of amount, either in this statute or in CERCLA. *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 669 (5th Cir.1989), *United States v. Alcan Aluminum Corp.,* 755 F.Supp. 531, 537–38 (N.D.N.Y.1991) (and cases cited therein). Therefore the presence of any detectable amount of these substances, without regard to concentration, is sufficient to satisfy the requirements of the statute. *United States v. Western Processing Co., Inc.,* 734 F.Supp. 930, 936 (W.D.Wash.1990) (proof that a release was above background levels was unnecessary; common law principle that the law does not concern itself with trifles is not a CERCLA defense).

In this case, Washington Gas has sufficiently alleged that acetone, methylene chloride, and tetrachloroethane are present in the soil of the HRW property, and that their presence is proof of a "disposal" under the

statute. HRW's contention that the designation of estimated values for the quantities of these substances is an indication that they do not exist at all is simply too speculative for this Court, and once again constitutes a mere possibility, which is not enough to throw the issue into doubt for purposes of summary judgment.

## F. Release

■ CERCLA requires a release, or threatened release, in order for liability to be triggered. A release pursuant to CERCLA is defined as follows:

> [A]ny spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant).... 42 U.S.C. § 9601(22) (1992).

The self-referential quality of CERCLA thus requires that there be both a disposal and a release in order to establish liability, but subsumes within its definition of "release" the concept of "disposal." The Court has already determined that a "disposal" of hazardous substances into the environment took place. Therefore the Court also holds that a "release" of hazardous substances took place. Failure to so find would result in a logical inconsistency.

Even were the concept of disposal not inherent within the definition of release, however, the Court would still find a release in this case, both of the constituent elements of coal-tar and of the other hazardous substances alleged to be detectable on the HRW property by Washington Gas. The very presence of these substances below the ground is at least as indicative of spilling, leaking, emptying or escaping, as it is of disposing. Given the breadth of the definitional language in CERCLA, it seems virtually impossible to conceive of a situation where hazardous substances are found in the soil and not *ipso facto* "released" into the environment. Certainly the undisputed facts in the present case allow for no other finding than that a release has taken place.

## G. Response Costs

The final element in establishing a *prima facie* case of liability under CERCLA concerns response costs. A party must show that it has incurred "necessary response costs" which are "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B) (1992). Washington Gas contends that the plaintiffs' costs were neither necessary nor consistent with the national contingency plan, and therefore moves for summary judgment. The plaintiffs, on the other hand, contend that their costs were both necessary and consistent with the plan, and they also move for summary judgment on this issue.

### 1. *The Statute and the National Contingency Plan*

The terms "respond" and "response" are defined by the statute as meaning: "remove, removal, remedy and remedial action, all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C. § 9601(25) (1992).

The terms "remove" and "removal" are also terms which have a defined, statutory meaning, which is, in pertinent part, as follows: "[T]he cleanup or removal of released hazardous substances from the environment, ... such actions as may be necessary to monitor, assess, and evaluate the release ... of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release." 42 U.S.C. § 9601(23) (1992).

In addition to the above-stated definitions, any costs incurred by the parties in this case must be consistent with the national contingency plan in order to be recoverable as response costs under CERCLA.

The national contingency plan ("NCP") is authorized by 42 U.S.C. § 9605, and is set out at 40 C.F.R. pt. 300 (1992). The plan authorizes, *inter alia*, for a remedial preliminary assessment ("PA") and a remedial site inspection ("SI"). 40 C.F.R. § 300.420. The NCP provides, in pertinent part, as follows:

"A remedial PA shall consist of a review of existing information about a release such as information on the pathway of exposure, exposure targets, and source and nature of release." 400 C.F.R. § 300.420(a)(2). Pursuant to the plan, if a PA report is prepared, it must include "(i) [a] description of the release; (ii) [a] description of the probable nature of the release; and (iii) [a] recommendation on whether further action is warranted ... and whether an SI or removal action or both should be undertaken." 40 C.F.R. § 300.420(4).

Should an SI be deemed appropriate, the NCP provides, in pertinent part, as follows:

(2) The remedial SI shall build upon the information collected in the remedial PA. The remedial SI shall involve, as appropriate, both on- and off-site field investigatory efforts, and sampling.

(3) If the remedial SI indicates that removal action may be appropriate, the lead agency shall initiate removal site evaluation pursuant to § 300.410.

(4) Prior to conducting field sampling as part of site inspections, the lead agency shall develop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs. The sampling and analysis plans shall consist of two parts:

(i) The field sampling plan, which describes the number, type and location of samples, and the type of analyses, and

(ii) The quality assurance project plan ... which describes policy organization, and functional activities and the data quality objectives and measures necessary to achieve adequate data for use in site evaluation and hazard ranking system activities.

(5) Upon completion of a remedial SI, the lead agency shall prepare a report that includes the following:

(i) A description/history/nature of waste handling;

(ii) A description of known contaminants;

(iii) A description of pathways of migration of contaminants;

(iv) An identification and description of human and environmental targets;

(v) A recommendation on whether further action is warranted. 42 C.F.R. § 300.425.

### 2. *HRW and Powell plaintiffs*

Washington Gas contends that the costs incurred by the plaintiffs are not "necessary" costs of response pursuant to the statute, and that the costs incurred were not consistent with the national contingency plan.

### a. *Necessary Costs*

■ The substance of Washington Gas' first contention is that any site investigation conducted by the plaintiffs was not a necessary response cost because it was performed "to further [p]laintiffs' litigation interests." Washington Gas, Memorandum, at 22. Washington Gas notes further that it proposed to conduct its own investigation of the site and to share the results with the plaintiffs, but that they refused, conducted their own investigation, and sued Washington Gas. Therefore, asserts Washington Gas, the investigation which was conducted, as well as the data recovered and the reports which were prepared, were all intended to further the plaintiffs' litigation interests and do not constitute necessary response costs.

Washington Gas cites no authority for this novel proposition. Indeed, Washington Gas offers little in the way of argument to support this contention. Rather, it chooses merely to state the proposition and move on. The reason for Washington Gas' reluctance to defend its position is readily apparent, because it is, legally and logically, wholly indefensible.

It was necessary for the plaintiffs to determine the extent and nature of the pollution of the subject property. This they did by conducting an investigation. Whether this investigation was in the nature of a PA or an SI, to use the terminology of the NCP, is, for the Court's present purposes, irrelevant. The investigations conducted by the plaintiffs describe the release, describe the probable nature of the release, and make some recommendations for future action. HRW Memorandum, Exhibits A–1, A–5. Such an investigation is, therefore, clearly consistent with

the NCP, and it falls under the rubric of "necessary costs."

The fact that the plaintiff can use the information gathered from the investigation, even to support a lawsuit, is, again, irrelevant to the issue before the Court. There is nothing in the NCP which contemplates that information gathered for one purpose cannot be used for another. In fact the statute clearly contemplates the use of information gathered as part of a "response" to be used for enforcement purposes. ("The terms 're-spond' and 'response' ... include enforcement activities related thereto." 42 U.S.C. § 9601(25)).[20]

Furthermore, the fact that the plaintiffs declined Washington Gas' invitation to delay their investigation until Washington Gas had conducted an investigation of its own does not render the costs incurred by the plaintiffs unnecessary. Nothing in the NCP or in the language of CERCLA indicates that the Government, or a potential plaintiff, must give a potential defendant the opportunity to conduct its own investigation of the site of alleged hazardous waste disposal before responding. In fact, such action might itself be considered inconsistent with the NCP, which requires the Government to evaluate a site "promptly" after receiving a notification of hazardous waste release. 40 C.F.R. § 300.-45(f)(1). For the plaintiffs in this case to have acceded to Washington Gas' request to delay their own action until it had first evaluated the site might later have left them open to charges of tardiness, and therefore inconsistency with the NCP.

Washington Gas also contends that the investigation was conducted for the sole purpose of confirming the existence of coal-tar residue, and that this, therefore, excludes the investigation from consideration as a necessary cost of response. Washington Gas Memorandum, at 23. The NCP provides for

the investigation of sites once a release has been discovered. The investigating agency needs information which will help it to characterize the release, including, but not limited to: "[l]ocation of the release; type(s) of material(s) released; an estimate of the quantity of material released; possible source of the release; and date and time of the release." 40 C.F.R. § 300.405(d). Once the agency has this information, it responds, according to the urgency of the situation, with a removal site evaluation or a remedial site evaluation. *Id.* In other words, the response contemplated by the NCP is triggered by information concerning a *specific* release, as happened in this case when the plaintiffs were made aware by Genstar that there was coal-tar residue on the property.

The response contemplated by the NCP does not, at least initially, broaden into an investigation designed to unearth *every* pollutant present on the property. Rather, the response is limited to the hazardous substance about which the agency has been notified. Therefore, it is of no moment that the plaintiffs in this case conducted their investigation only for the purpose of confirming the presence of coal-tar.[21]

### b. Consistency with the NCP

Washington Gas also asserts that the costs incurred by the plaintiffs were inconsistent with the NCP. Specifically, Washington Gas contends that the plaintiffs' investigation did not " 'assess the nature and extent of the problem' and did not 'confirm its source.' " Washington Gas, Memorandum, at 24. The issue here revolves around the methodology employed by the plaintiffs' investigators and the conclusions which they derived from the data they produced.

Once again, Washington Gas provides no authority to support this position. Also once

---

20. This is not to say that there are no circumstances in which an investigation, conducted purely for the purposes of litigation preparation, might be deemed to be "unnecessary" for the purposes of CERCLA, or that such an investigation might be held to be "inconsistent" with the NCP. All the Court holds here is that such is not the case with the investigation conducted by HRW and the Powell plaintiffs.

21. Washington Gas also challenges the necessity of the plaintiffs' investigation on the grounds that "it is not clear what costs [p]laintiffs include or rely upon as their 'response costs.'" Washington Gas, Memorandum, at 21. This argument is not relevant to the issue before the Court here, having to do with the appropriate valuation of the plaintiffs' investigation rather than the appropriateness of the investigation itself.

again, this is apparently because the position is insupportable. Washington Gas does not dispute that there is coal-tar on the property owned by the Powells and HRW. In complaining about the way in which the plaintiffs' investigation was conducted, it is disputing the magnitude of the pollution. It also disputes the 'migration' theory propounded by the plaintiffs. Such disputes, however, have nothing to do with whether the costs incurred by the plaintiffs in conducting this investigation were "consistent" with the NCP. Nothing in the NCP indicates that the PA or SI must be performed in a particular way, or using a particular methodology. The only question before the Court which is relevant to this particular issue is whether the investigation conducted by the plaintiffs was consistent with the NCP. The Court is satisfied that it was, because, as noted above, the report describes the release, describes the probable nature of the release and makes some recommendations for future action. That is all that the NCP requires, and it is all that the Court will require also.

As to Washington Gas' challenge to the migration theory, the Court notes, as it also has above, that Washington Gas admits in its pleadings that Maryland, its corporate predecessor, caused the pollution ("[T]he activities *that produced the contamination* had ceased . . ." Washington Gas, Memorandum in Support of Motion for Summary Judgment as to Successor Liability, at 16 (emphasis supplied)). Even were this not the case, however, the Court finds that Washington Gas has not generated a material issue in dispute as to the cause of the coal-tar pollution. Although it challenges the methodology, and therefore the results, of HRW's report, it offers no alternative theory as to how the coal-tar reached HRW's property. Washington Gas has, of course, offered the theory that some of the coal-tar contamination might have been caused by HRW's activities—a theory which the Court has dismissed as too speculative. In the absence of any alternative theory, therefore, the Court finds that the coal-tar did indeed migrate from the property previously owned by Washington Gas' corporate predecessor.

### 3. *Washington Gas*

■ In order for Washington Gas to succeed in its action against HRW and the Powell plaintiffs, it must convince the Court that the costs which *it* has incurred in responding to the pollution which has been discovered on the subject property are "necessary" under, and "consistent" with, the NCP.

Although this issue is not raised by the plaintiffs, the Court is forced to wonder whether this is not an occasion when the defendant is hoist by his own petard. Washington Gas argued that the plaintiffs' investigation was conducted for the purposes of litigation, and therefore was not "necessary" pursuant to the NCP. The Court rejected this contention. When viewed in the context of Washington Gas' response costs, however, the argument becomes more persuasive.

There is no question that Washington Gas conducted its investigation of the property in anticipation of litigation. Washington Gas had already attempted to forestall HRW from filing suit by offering to conduct this investigation, and it attempted to dissuade the Powell plaintiffs from becoming parties to the litigation by making the same offer. Washington Gas Memorandum, at 22–23. Although the chronology is not explicitly stated, it was presumably only after these offers were rejected, and suit had been filed against it, that Washington Gas conducted its investigation.

As noted above, an investigation can be necessary, pursuant to the NCP, and also fulfill a litigation function. In this case, however, an investigation (conducted by the plaintiffs) had already been undertaken, thus calling the 'necessity' of the defendant's investigation into question. Washington Gas does not indicate the section of the NCP which authorizes a second investigation of the site by the alleged polluter, nor is this Court aware of any such section. This is not to say, of course, that the alleged polluter would not have the right to such an investigation—merely that the expense of conduct-

ing the investigation would not be considered "necessary" under CERCLA.[22]

The Court is inclined to hold that Washington Gas incurred the costs of a site investigation which was not necessary, as contemplated by CERCLA, and that therefore it has failed to make out the elements of a *prima facie* case of liability against HRW and the Powell plaintiffs, thus making entry of summary judgment against Washington Gas appropriate. Certainly, when the statute and the NCP are viewed narrowly, this would appear to be the correct result. Although an investigation can be necessary and consistent with the NCP, and at the same time serve as an aid to litigation, an investigation which is purely for the purposes of defending against a lawsuit cannot be considered "necessary" under CERCLA and should, under this analysis, be unavailable in the calculation of response costs under the statute.

■■■■ A narrow view, however, is not appropriate when looking at CERCLA. It is well established that in order to achieve its legislative goals, CERCLA must be viewed broadly. *First United Methodist Church v. United States Gypsum Co.*, 882 F.2d 862, 867 (4th Cir.1989), *Kaiser Aluminum & Chemical Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1343 (9th Cir.1992), *3550 Stevens Creek Assoc. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1363 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991). The goals of CERCLA include the discovery and removal of hazardous substances. When viewed in this context, *any* investigation which could lead to the discovery of hazardous substances at a site, or the extent to which the site is polluted, could be considered "necessary" in order to accomplish the goals of the statute.

This is a very close call. However, the Court cannot say that Washington Gas' investigation of the site, when viewed in the context of the liberal interpretation which courts must accord the statute, was not necessary. Summary judgment, therefore, would be inappropriate on this issue.

**22.** There is no question that the investigation conducted by Washington Gas was consistent

### 4. *Attorney's Fees*

The final issue which arises under consideration of necessary response costs pertains to the recoverability of attorney's fees. The plaintiffs, of course, wish to recover these fees within, and the defendant seeks to exclude them from, the response costs calculation. The issue is apparently one of first impression for a court in this District, although it has been addressed by other District Courts in the Fourth Circuit. *See Chesapeake and Potomac Telephone Co. v. Peck Iron & Metal Co., Inc.*, 814 F.Supp. 1281 (E.D.Va.1993).

■■■■ The dispute here revolves around the applicability of the "American Rule" concerning recovery of attorney's fees, which provides that these fees cannot be recovered by successful parties unless provided for by contract or statute. *See Alyeska Pipeline Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (Absent congressional authorization, prevailing party cannot collect attorney's fees). Because CERCLA makes no explicit grant of attorney's fees, the defendant argues that the American Rule should operate as a bar to recovery of attorney's fees in this case. This was the apparent holding of an unpublished case in the Eastern District of Virginia, *Board of Supervisors of Fauquier Co. v. Fiberglass Eng'g Co., Inc.*, C.A. No. 89-1454-A (E.D.Va.1990), in which Judge Bryan opined as follows:

> Had Congress wanted to make an allowance of attorney's fees an entitlement for a successful plaintiff, it could easily have specifically done so.... Although—as the court has already noted—an Act like CERCLA is generally liberally construed, it is well settled that an exception to the so-called "American Rule" on attorney's fees must be specifically carved out by the statute. Mem.Op. at 6–7, *quoted by, Peck Iron*, 814 F.Supp. at 1282.

In contrast to this holding, the court in *Peck Iron* held that the purpose of CERCLA, together with the language of the statute

with the requirements of the NCP.

permitting recovery of fees and costs associated with the clean-up of polluted sites from the party responsible for causing the pollution, is sufficient to satisfy the technical constraints of the American Rule, as well as the plain Congressional intent which underpins the statute.

The appellate decisions of other circuits are not particularly instructive for the purposes of this analysis, splitting cleanly into allowing recovery: *Donahey v. Bogle*, 987 F.2d 1250 (6th Cir.1993), *General Elec. Co. v. Litton Indus. Automation Systems, Inc.*, 920 F.2d 1415 (8th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991); and barring recovery, *In re Hemingway Transp., Inc.*, 993 F.2d 915 (1st Cir. 1993), *Stanton Road Assoc. v. Lohrey Enterprises*, 984 F.2d 1015 (9th Cir.1993). Given the split of authority within the judicial circuits, the topicality of the issue, and the Fourth Circuit's silence on this issue thus far, this Court has no illusions as to the permanence of any holding made here. It is to be hoped that the higher courts will soon rule on this issue, which, it seems to this Court, is of vital importance to the long-term viability of private recovery actions under CERCLA.

In the meantime, the Court notes that the quality of lawyering in the present case is extremely high. This speaks well of the law firms, and many lawyers, involved in this litigation, but also reminds the Court that such articulate advocacy does not come cheap. Given the complexity of the statutory scheme in this area, the current billing practices of the law firms that are able to devote the time and expertise into litigating these cases, as well as the length of time which litigation of this complexity must take, the only conclusion to be drawn is that environmental litigation is an extremely expensive business. In order to press their claims successfully, both private individuals and corporate entities would have to be able to devote significant resources to attorney's fees, were these not to be available as necessary response costs.

This conclusion leads inevitably to the conclusion that the absence of attorney's fees as a recoverable cost of response will act as a huge and, in many cases, insurmountable, obstacle to those seeking to bring private recovery actions under CERCLA. This in turn would frustrate the purpose of the statute in allowing, and in fact encouraging, such actions, and instead throw the lion's share of enforcement actions on the financially stooped shoulders of the Government. This was seemingly the precise result which the institution of the private recovery action under CERCLA was intended to avoid.

Once again, the language in which Congress chose to express itself in this area was less than precise. Once again, the Court is forced to attempt to interpret the statute with little more than the dowsing-rod of legislative intent. In the area of attorney's fees, however, this Court feels the twigs dipping strongly toward recovery of attorney's fees. Although the arguments of the First and Eighth Circuits are well-reasoned and logical, the Court is persuaded by the arguments presented in *Peck Iron* and *General Electric Co.*. Thus, when the time comes for the calculation of the response costs to be submitted to this Court, the prevailing party or parties may include all *necessary* attorney's fees as part of the response cost calculation. As in other cases, over-staffing and over-papering will not be rewarded.

### H. Defenses

All of the elements for a *prima facie* case have been made out by plaintiffs, on their motions for summary judgment, and the defendant, on its cross-motion for summary judgment. Under CERCLA, liability is absolute when all of the elements are satisfied, subject only to the defenses set forth in § 9607(b). Washington Gas does not attempt to assert any affirmative defense, nor would it be appropriate for it to do so given the facts of this case. Both the Powell plaintiffs and HRW, however, vigorously assert the "innocent landowner" defense provided for by the statute which is, yet once more, where the analysis must begin.

#### 1. *The Statute*

CERCLA provides for the following defenses from liability:

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of a release of a hazardous substance and the damages resulting therefrom were caused solely by—

(1) an act of God;

(2) an act of war;

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs. 42 U.S.C. § 9607(b) (1983).

In this case, there is no question of acts of God or war. The only available defense, therefore, is that of the innocent landowner. Such a defense is, of course, unavailable to Washington Gas, which does not attempt to assert it. Washington Gas does, however, challenge the availability of this defense for each of the plaintiffs.

### 2. *The Powells*

■ The substance of Washington Gas' objection to the Powell plaintiffs' assertion of the innocent landowner defense is that they have a direct or indirect contractual relationship with the defendants.

The term "contractual relationship," for purposes of § 9607(b), includes, but is not limited to:

[L]and contracts, deeds or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant[23] after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence:

(i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.

\* \* \* \* \* \*

(B) To establish that the defendant had no reason to know, as provided in clause (i) of subparagraph (A) of this paragraph, the defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability. For purposes of the preceding sentence the court shall take into account any specialized knowledge on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection. 42 U.S.C. § 9601(35).

The Powells purchased the property in 1959 from Michael Marinelli, who had, in turn, purchased it from Washington Gas' predecessor corporation. Prior to purchase, the Powells had rented the land from Mr. Marinelli for seven years. Thus, contends Washington Gas, under the terms of § 9601(35)(A), the Powells stand in a contractual relationship with Washington Gas' predecessor, and

---

**23.** Although the statute speaks here of the "defendant," this analysis is applicable to the Powell plaintiffs in this case.

thus with Washington Gas.[24]

The Court has held *supra* that the Powells did not actively dispose of the hazardous waste on their property. The Court's holding above that there was a disposal of hazardous waste which rendered the Powells liable, even though they did not participate in the disposal, is not relevant to the discussion here. Although for purposes of § 9607(a) there was a disposal in this case, were that holding to affect a consideration of the defense outlined above, there would be, for all practical purposes, no innocent landowner defense, so broad is the statute's definition of "disposal."

More to the point, however, is the question of what the Powells knew, or had reason to know, at the time they purchased the land from Mr. Marinelli. Washington Gas claims that the Powells knew that the land had been owned by the gas company prior to their having acquired it, and that it was common knowledge in the community that gas had been manufactured there. Washington Gas claims that this knowledge put the Powells on notice that there might be contamination in the ground.

The issue here is what the statute means by "appropriate inquiry" into the condition of the land, and which "customary practice" should be used to evaluate the landowner's actions. The Powells contend that, in 1959, pre-purchase investigations of the land for hidden environmental problems were not performed, and that therefore such an investigation should not be deemed an appropriate inquiry or a customary practice.

■ It is clear that the standards which the Court must apply to an analysis of the appropriateness of the owner's conduct must be those which were in effect at the time of the purchase. Any other finding would hold landowners to the impossibly high standard of complying with current perceptions of appropriateness in an area where perceptions change quickly.

That being said, however, it is a difficult proposition for the Court to turn back the clock to 1959 and make a determination of the Powells' behavior based only on the standards of the time. Given the information provided to the Court in the pleadings, it is a task which is impossible to accomplish. The Powell plaintiffs have supplied the affidavit of M. Ronald Lipman, a real estate appraiser, which asserts that environmental issues were not a concern in the real estate business in the early 1960's. Powell Plaintiffs, Appendix 6, at 2. Notwithstanding the fact that Mr. Lipman's experience dates from the early 1960's and the period in question is the late 1950's (although the Court does not seriously consider that real estate practices shifted dramatically in a few years), Mr. Lipman's affidavit does not help the Court in its analysis of the other issues raised by the statute: any specialized knowledge on the part of the Powells; the relationship of the purchase price to the value of the property; commonly known or reasonably ascertainable information about the property; the obviousness of the presence or likely presence of contamination at the property; and the ability to detect such contamination by appropriate inspection. These are material issues of fact, which are in dispute, and which the Court cannot resolve on summary judgment.

For this reason, the Court will *deny* the Powell plaintiffs' Motion for Partial Summary Judgment as to WGLC's Liability Under CERCLA, and *deny* Washington Gas' Cross–Motion for Partial Summary Judgment as to Liability Under CERCLA. The issue of whether or not there was a contractual relationship between the Powells and Washington Gas must be decided by a factfinder at trial.

### 3. *HRW*

■ The issues surrounding HRW's assertion of the innocent landowner defense are somewhat different to those discussed above. Washington Gas contends that, since the release of hazardous substances was not caused solely by Washington Gas, as required by the statute, there should be no defense available to HRW.

In addition, Washington Gas contends that HRW did not exercise due care with respect

---

24. Washington Gas does not, of course, concede the issue of successor liability. Anticipating the Court's holding above, however, they make this argument in the alternative.

to the hazardous substances concerned, and that HRW did not take the necessary precautions. As to these arguments, however, Washington Gas contents itself with the assertion that HRW did not sufficiently investigate the property at the time of purchase. Whether true or not, this argument is irrelevant here. As discussed above, that issue forms part of the analysis of whether or not a contractual relationship existed between the parties. There is no question of a contractual relationship between HRW and Washington Gas, and Washington Gas cannot simply import that argument by couching it in terms of due care and precaution.

■■■■ The statute clearly does not contemplate a party taking due care and precautions *prior to* the discovery of any hazardous substances or knowledge of the possibility of pollution. Nor does the language of this section of the statute impose a duty on a purchaser of land to investigate prior to purchase, in order to determine whether there is pollution on the land caused by someone with whom the purchaser is not in contractual privity. Rather, the statute requires the owner of property to exercise due care with respect to the hazardous substance concerned, and to take precautions against the foreseeable acts or omissions of a third party.

■■■ All that the statute requires here is that a land owner who has knowledge of the possibility of pollution through the acts or omissions of a third party should exercise due care, and take appropriate precautions, in order to insure that no pollution occurs. There is no implication in Washington Gas' papers that HRW has failed to exercise due care, or take the appropriate precautions, when viewed in this light. Therefore the only remaining issue is whether the release of the hazardous substances, and the damages resulting from their release, was caused solely by Washington Gas.

Washington Gas contends that HRW contributed to the contamination by its own disposal of hazardous substances. Furthermore, Washington Gas alleges that there are areas on the HRW property which are polluted, and hazardous substances contained in the soil of the property, which are not connected to the manufacture of gas, and therefore were not caused by Washington Gas.

Neither of these arguments is persuasive. The Court has held above that Washington Gas has presented insufficient evidence that HRW caused any of the coal-tar pollution on the site. The Court will not require HRW to share in the responsibility of the pollution of its property by coal-tar on the basis of speculation that it is "probable" that it caused "some" of the problem.

■■ Nor will the Court hold HRW liable for the cleanup of its property because of the presence of other hazardous substances in the ground. The Court has held that the acetone, methylene chloride and tetrachloroethylene which Washington Gas has found on HRW's property constitutes a "disposal" for purposes of CERCLA. This does not mean, however, that this disposal deprives HRW of the innocent landowner defense to liability. The statute requires only that the landowner prove that "the release ... of a hazardous substance and the damages resulting therefrom were caused solely by ... an act or omission of a third party." 42 U.S.C. § 9607(b). Had Congress intended to deprive landowners of this defense, it could have phrased the language of this portion of the statute in the plural, requiring proof that the release of hazardous *substances* was caused by a third party, or that the release of *all* hazardous substances found on the property was caused by a third party. By selecting the singular form, Congress clearly intended that the party responsible for the pollution should be liable for its cleanup.

This is not to say, of course, that Washington Gas is without recourse as to the cleanup of the acetone, methylene chloride and tetrachloroethylene. If it should so chose, it is free to make a claim for that portion of the cleanup expense which relates to these chemicals. In that way, each party can, and will be, held liable for the pollution which it caused, thus satisfying the goal of CERCLA as indicated by the language of the statute.

For the above reasons, HRW's Motion for Partial Summary Judgment as to Liability will be *granted,* with respect to CERCLA, and Washington Gas' Cross–Motion for Par-

tial Summary Judgment as to Liability will be *denied*.

## V. STATE LAW CLAIMS

The plaintiffs have included a series of state law counts in their complaint. These claims are properly before this Court. *White v. County of Newberry*, 985 F.2d 168 (4th Cir.1993). The plaintiffs have moved for summary judgment based on a theory of strict liability against the defendant. The defendant, in turn, has moved for summary judgment on each count individually against both plaintiffs.

A threshold issue to consideration of all of these motions is, once again, the question of successor liability. The Court's holding above that Washington Gas is liable as the successor corporation to the gas company which actually owned and operated the gas manufacturing plant at the Hyattsville site was based on a theory which is shared by the federal and Maryland courts. It is, therefore, as applicable in this context as it was in the CERCLA analysis, as the Court held above. As such, the Court simply reiterates its holding that Washington Gas may be held liable for the activities of its predecessor corporations.

There are, however, two other issues which the Court must consider before embarking on the long march through these claims.

### A. Statute of Limitations

■ Washington Gas asserts that the time for the state law actions has run, and that therefore the plaintiffs should be barred from asserting these claims. Washington Gas has moved for summary judgment on this issue, which motion has been vigorously opposed by the plaintiffs.

■ The relevant Maryland statute here is Md.Cts. & Jud.Proc.Code Ann. § 5–101 (1989), which requires that civil actions must commence within three years from the time the action accrues. Accrual occurs when a party acquires actual knowledge of a fact's existence, either through "express cognition, or awareness implied from knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry ... with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued." *Poffenberger v. Risser*, 290 Md. 631, 637, 431 A.2d 677, 681 (1981) (citations omitted).

In 1971, HRW acquired a parcel of land immediately adjacent to property on which had formerly been located a gas manufacturing plant. In 1979, Clark Enterprises, Inc. ("Clark") purchased this property and leased it back to HRW. Finally, in 1986, Clark purchased another parcel of property adjacent to the original purchase, and these two plots together make up the site known as the HRW property.

Washington Gas contends that HRW had a duty to inspect its property in 1971 when it bought it, that Clark had a duty to inspect in 1979 when it purchased the HRW property, and that Clark had an obligation to inspect the property which it purchased in 1986. Washington Gas' contention is founded on the principle of *caveat emptor*. Thus, contends Washington Gas, HRW should have known of the existence of pollution under the soil, or it knew of circumstances which ought to have put it on inquiry to investigate the property, which inquiry would have disclosed the existence of the pollution underground. Washington Gas therefore contends that the accrual time for HRW's cause of action ran as early as 1971, or as late as 1986, but in either case, it ran many more than three years prior to the institution of this action, thus rendering the state law claims time-barred.

Washington Gas' contention that the Powell plaintiffs are also time-barred from bringing state law claims in this case rests upon slightly different facts. Washington Gas contends that the Powells should have known of the condition of their land as early as 1959, when they purchased it from Mr. Marinelli after leasing the land from him for several years. Again, Washington Gas relies on the principle of *caveat emptor* to support its contention that the purchaser of property has a duty to inspect it.

Even if the Powells did not know that the land was polluted, or should have known of circumstances which put them on inquiry to

investigate the property, Washington Gas argues that the MDWMA investigation of the property in 1986 should have put the Powells on notice. This investigation, which concluded in a report indicating that the land might be contaminated, listed Mr. Eliot Powell as the owner of the property and was, in the words of Washington Gas, "a matter of public record." Washington Gas, Memorandum in Support of Summary Judgment Motion as to Powell Complaint Counts II–VI, at 9.

■ The Court places no reliance in Washington Gas' theory of constructive knowledge under the doctrine of *caveat emptor.* The Court of Appeals of Maryland has made it clear that constructive knowledge is *not* an appropriate basis for determining whether or not a statute of limitations began to run on a particular date. *Poffenberger,* 290 Md. at 637, 431 A.2d at 681. Nor can the Court rule that a report which listed Mr. Powell as the owner of potentially polluted property, and which, although a matter of public record, might or might not have been in fact read by the Powell plaintiffs, is sufficient evidence that the Powell plaintiffs had sufficient knowledge of the state of their land, such that the statute of limitations started running against them.

The question of what knowledge the plaintiffs had concerning the condition of their property, and when they had it, is clearly material, and, equally clearly, is in dispute. As such, it would be inappropriate for the Court to grant summary judgment on this issue. Therefore, Washington Gas' Motion for Summary Judgment based on the expiration of the relevant statute of limitations against both plaintiffs will be *denied.*

**B. Termination of Liability Upon Transfer**

■ The other issue the court must consider here is Washington Gas' contention that any liability which it might have had to the plaintiffs was terminated upon transfer of the land to Mr. Marinelli, and subsequently to the Powell plaintiffs. Washington Gas claims that in Maryland, a prior owner of property has no long-standing liability to subsequent purchasers of the property and, by extension, to neighbors of that property. It alleges that any such liability terminates upon the passage of a "reasonable" period of inspection. This, alleges Washington Gas, had long passed in this case before discovery of the pollution, and therefore it should have no liability to either HRW or the Powells.

■ In support of this theory, Washington Gas cites the Court to *Counsel of Co-Owners Atlantis Condominium, Inc. v. Whiting–Turner Contracting Co.,* 308 Md. 18, 517 A.2d 336 (1986). In this case, the Court of Appeals of Maryland held that the liability of a seller of land to those that subsequently come onto the land is dependent on a number of factors. *Atlantis Condominium,* 308 Md. at 37, 517 A.2d at 346. "[W]here the condition existed at the time of transfer, the vendor's duty to third parties and to the vendee will survive the sale and transfer if the vendor knew or had reason to know of the condition and of the risk involved, and failed to disclose that information to the vendee. *Restatement (Second) of Torts* §§ 352 and 353. This duty remains with the vendor only until the vendee has notice of the condition and a reasonable opportunity to take precautions against it." *Id.* The court also notes that the precise timing of the lifting of this duty to third parties must be calculated in relation to the knowingness of the seller's behavior. If the seller actively concealed the condition, then liability continues until actual discovery and a reasonable opportunity to take precautions against the hazard. If the seller merely omitted to mention the hazard, then liability continues only until the purchaser has had a reasonable opportunity to discover and take precautions against the hazard. *Id.* at n. 6.

One of the principal differences between the determination of liability under CERCLA and liability under the Maryland common law thus is clearly that of knowledge. Whereas under CERCLA, knowledge is irrelevant if the fact of pollution exists, under the Maryland common law, a determination of the knowledge of both plaintiffs and defendants is crucial, both as a threshold issue and in determining liability. Given the circumstances of this case, however, this determination is one which the Court cannot make at this stage in the proceedings. The Court is no more able to decide now whether or not

Washington Gas knew of the hazardous condition of its land when it sold it to Mr. Marinelli than it was able to decide whether or not HRW and the Powells were aware of the hazardous nature of their land when they bought it. These are questions more appropriately answered at trial rather than at summary judgment on the present record.

Without the resolution of these issues, there would be little point in the Court making rulings on the parties' motions for summary judgment with respect to the state law claims. Therefore, these motions will all be *denied,* and the issues raised thereby will be resolved at trial.

## VI. CONCLUSION

The issues in this case are both novel and complex. They have been ably and clearly presented by counsel for all parties, for which counsel have the Court's thanks. It is to be hoped that the remaining issues are now sufficiently delineated that this case can proceed in a speedy and orderly fashion towards resolution, and that the ultimate goal of CERCLA litigation—the cleanup of the property in question—can soon be achieved.

For the reasons stated above, the various pending motions will be granted or denied as follows: Washington Gas' Motion for Summary Judgment as to Successor Liability will be *denied;* HRW's and the Powell Plaintiffs' Motions for Partial Summary Judgment as to WGLC's Liability under CERCLA will be *granted,* with respect to successor liability; the Powell Plaintiffs' Motion for Partial Summary Judgment as to WGLC's Liability under CERCLA will be *denied* in all other respects; Washington Gas' Cross–Motion for Summary Judgment as to Liability under CERCLA will be *denied;* HRW's Motion for Partial Summary Judgment as to Liability will be *granted,* as it relates to CERCLA; HRW's Motion for Partial Summary Judgment as to Liability will be *denied,* as it relates to strict liability under state law; Washington Gas' Motion for Summary Judgment as to Counts II–V of the Complaint filed by Clark Enterprises, Inc., and HRW Systems, Inc., will be *denied;* and Washington Gas' Motion for Summary Judgment as

to Counts II–VI of the Complaint filed by Powell & Powell will be *denied.*

## ORDER

For the reasons stated in the foregoing Memorandum, IT IS, this 9th day of June, 1993, by the Court, ORDERED:

1. That defendant Washington Gas Light Company's Motion for Summary Judgment as to Successor Liability BE, and the same hereby IS, DENIED;

2. That plaintiffs' HRW Systems, Inc., and Clark Enterprises, Inc. Motion for Partial Summary Judgment on Liability BE, and the same hereby IS, GRANTED, with respect to successor liability and CERCLA liability;

3. That plaintiffs' HRW Systems, Inc., and Clark Enterprises, Inc. Motion for Partial Summary Judgment on Liability BE, and the same hereby IS, DENIED, with respect to strict liability under the common law;

4. That the Powell plaintiffs' Motion for Partial Summary Judgment on Liability BE, and the same hereby IS, GRANTED, with respect to the successor liability of the Washington Gas Light Company;

5. That the Powell plaintiffs' Motion for Partial Summary Judgment on Liability BE, and the same hereby IS, DENIED, in all other respects;

6. That defendant Washington Gas Light Company's Cross–Motion for Partial Summary Judgment as to Liability under CERCLA BE, and the same hereby IS, DENIED;

7. That defendant Washington Gas Light Company's Motion for Summary Judgment as to Counts II–V of the Complaint filed by Clark Enterprises, Inc., and HRW Systems, Inc. BE, and the same hereby IS, DENIED;

8. That defendant Washington Gas Light Company's Motion for Summary Judgment as to Counts II–VI of the Complaint filed by Powell & Powell BE, and the same hereby IS, DENIED.